UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEVIN MCNULTY,<br><br>           Defendant. | Crim. Action No. 1:23-cr-00235-TSC-1 |

**MEMORANDUM IN AID OF SENTENCING**

## Introduction

Actions speak louder than words. And when it comes to what Devin McNulty did immediately following January 6, 2021, his actions speak volumes. He did not wait to turn his life around until he was arrested on June 14, 2023 (Doc. 5), two and a half years after the incident. Rather, in the immediate aftermath of January 6, Devin took action to ensure that such a thing would never happen again.

Right after January 6, Devin returned home in a haze and reflected deeply on what he had done as a 24-year-old young man. He quickly identified the pernicious roots of his participation in January 6: his Internet addiction, his alcohol abuse, and his social isolation. (PSR ¶¶ 52, 64, 65). And he acted immediately to dig out those roots and restore a healthy balance to his life. He got rid of his smart phone. (PSR ¶ 66). He stopped drinking. (PSR ¶ 67). He moved out of his solo apartment and began living with friends again. He joined a faith community. (PSR ¶ 53). And he began

regular mental health counseling (PSR ¶ 63) and joined a weekly support group (Exhibit A at 4). All of this allowed Devin to re-prioritize what had always been most important in this life: his relationships with other people. No one urged him to engage in this self-reflection or make any of these changes. He acted wholly on his own initiative, long before his arrest, because he knew what he had done was wrong and he wanted to make sure it would never happen again.

Devin made important changes to his life after January 6, but in many ways his transformation was a return to form, and he continued to be the kind, generous, and helpful person he always had been. Before, during, and after January 6, Devin's instinct has been to help other people. After starting his own small business, Devin hired a young man who had multiple juvenile convictions, and helped the young man obtain a driver's license. (Exhibits B, C). Even while caught up in reprehensible mob conduct on January 6, he urged other protestors to back away from an officer who had fallen to the ground—stretching out his arms to prevent any harm from befalling that officer. Meanwhile, he has continued to help others: providing a friend a free place to stay (Exhibit B), helping another friend pay off his $3,000 car payment (Exhibit D at 1), volunteering at a summer youth camp (Exhibit E), recently hiring a convicted felon who was having difficulty finding work due to his criminal record and helping him find more affordable housing (Exhibit F), and calling 911 to help car accident victims stranded on the side of the road (Exhibit G at 1).

Devin's offense conduct was serious—he pushed against an officer's riot

shield multiple times. But in light of Devin's extraordinary demonstration of remorse as illustrated through his actions, the way ███████████████

███████████████████████████████████████

███████ his exceptionally kind character, and the comparatively light sentences of other January 6 defendants who engaged in far more violent conduct, we respectfully request that the Court sentence Devin to probation, with or without a condition of home confinement.

### The Life of Devin McNulty

**I.   Despite a horrific childhood, Devin became a responsible and compassionate young man**

When Devin McNulty was a child, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

████████████████████████████████████████

██████████████████████████████████████, he never had too much on his plate to help when I had a question. He helped me with homework, taught me . . . to play the guitar, and how to skateboard. . . . He's never been too busy to support myself and others." (Exhibit H). Furthermore, Devin "tutored others in college in his math classes." (*Id.*).

Soon after Devin turned 18, he struck out on his own. Devin obtained a general associates degree and also started his own moving company, "Cool Movers." And Devin continued exhibiting kindness towards others, including those with



criminal histories. For example, when Clayton Bledsoe (pictured here in the orange shirt next to Devin) was only 18 years old, he had been in juvenile detention several times and was on an ankle monitor. Clayton had also tragically lost his father. Devin gave him a second lease on life, mentoring Clayton and helping him reintegrate into the community by hiring him to work for Cool Movers and helping Clayton obtain a driver's license. (*See* Exhibits B, C). As Clayton describes, Devin

"helped me grow so much as a person," "has been someone I have looked up to for his character and influence," and "repeatedly told me how important it is to choose my friends wisely" (Exhibit B). Clayton goes on to attest to how Devin has helped others, such as providing a place to stay for a friend who had no other options (*see id.* ("He allowed another friend, Josh, a place to stay when he did not have anywhere to go"). Clayton's grandmother further corroborates the positive influence that Devin had on Clayton's life. (*See* Exhibit C ("Devin was a great mentor to my grandson. Devin encouraged him to read books about business and finances. . . . He encourages [his employees] to improve their lives and expand their education.")).

Friends surrounded Devin, and over the next several years up until 2019, he regularly lived with roommates and friends as he embarked on the first chapter of his adulthood. Little did he know at that time just how important that would be.

II. **Social isolation and pandemic stress led to anxiety, drinking, and doom scrolling**

In 2019, Devin decided (like many young adults) around the age of 23 that he wished to live by himself. (PSR ¶ 64). But he underestimated what that separation from his friends would end up doing to his psyche. The COVID pandemic hit soon thereafter, exacerbating his isolation. Devin became increasingly anxious and wondered whether "society would ever return to a regular state of functioning." (PSR ¶ 64). Cool Movers was also starting to face economic difficulties because of COVID. (*Id.*)

The extreme social isolation, exacerbated by Devin's first time living by himself, triggered Devin in a particularly unique way. (PSR ¶ 64). ▮▮▮▮▮▮▮▮

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

This maelstrom of fear, anxiety, and confusion drove Devin to the Internet as a false sense of refuge. Devin admits spending approximately 8-10 hours a day on the Internet reading about conspiracy theories. (PSR ¶ 64). COVID restrictions were Devin's primary political grievance. (But at no point did he ever join any white nationalist or white supremacist organizations, nor did he ever participate in Q-Anon or any such like-minded organizations.)

Furthermore, like many Americans, the isolation of the COVID pandemic drove Devin to alcohol abuse, which is sadly unsurprising given the generational nature of alcohol abuse and his parents' own addiction to alcohol. He developed a weekly ritual, getting intoxicated at the same bars every Thursday, Friday, and Saturday.

Things came to a head shortly before January 6, 2021. Near that date, Devin decided he wanted to go to D.C. to exercise his First Amendment right to protest and to hear former President Trump speak. Devin went as an individual protestor. He did not coordinate his travel with any organization, let alone any far-right groups planning on much more than peaceful protest. He did not bring any weapons, restraints, or equipment with him. He did not disguise himself or use a

burner phone. He did not meet up with anyone in Washington or coordinate his conduct on January 6 with anyone else.

### III. On January 6, Devin succumbed to frustration and pushed an officer's shield, but even on that day, his character was on display

When Trump instructed the protesters to march to the Capitol, Devin believed the crowd would simply continue exercising their First Amendment rights on the capitol grounds. As the world now knows, things spiraled out of control. When Devin saw a thick row of police officers with riot shields marching in force towards people who Devin thought had a First Amendment right to be there (as encouraged by then-President Trump), Devin expressed his frustration by pushing three times against the riot shield of a capitol officer. His offense was serious. But at no point did he punch, strike, or hit the officer.

At the same time, in the midst of the chaos, Devin's kindness shone through. For example, when a capitol police officer fell to the ground, protestors began to circle her. But Devin (pictured below) immediately stretched out his arms and hands to give the fallen officer plenty of space to recover and get back up. He acted to physically prevent anyone from harming the vulnerable officer.[1]

---

[1] Defense counsel will be filing a short video clip of this incident which better illustrates this moment and provide a copy for Chambers.



In another moment, Devin used what little drinking water he had to help a man whose eyes were injured by tear gas.



**IV.   After January 6, Devin immediately transformed his life, effectively rehabilitating himself two and a half years before his arrest**

Devin left Washington, D.C. in a haze. But he quickly came to his senses and realized what had happened and did not wait until he was arrested to reflect on

what he had done. He immediately recognized what the Internet had done to his brain and took action.

**First**, he immediately unplugged from the Internet at home. He recognized that watching news-related, emotionally inflammatory material on YouTube was a major cause of his conduct. So the last such video he watched was on January 7, the day after the incident. He got rid of his TV and wifi soon thereafter.

But he knew that was not enough. Devin later realized that cutting himself off from the poison of the Internet would require getting rid of his smart phone as well. As the attached statement from Devin demonstrates, Devin at first tried to use app blocking software, but realized he could just get around them. (*See* Exhibit A at 1). As he tells it, he was determined to change the "negative habits and thought patterns I had identified in myself through introspection, journaling and conversations with friends and mentors." (*Id.*) He learned about "media addiction, compulsive scrolling[,] and how compulsive media usage has an effect on the brain." (*Id.* at 2). He realized on his own that he was the type of person who "analyze[s] bad news over and over again, to see if somehow understanding the problem will help them find a solution," making him more vulnerable to "doom-scrolling" "as a coping mechanism to deal with anxiety." (*Id.* at 3). So, knowing more drastic measures needed to be taken, Devin began trying out different brands of "dumb phones," ultimately spending hundreds of dollars on different phones until he found the right one. (*See generally id.*; *see also* Exhibit D (letter from Zach Burkett noting Devin is not "constantly on social media" and instead "reads and focuses on his hobbies")).

**Second**, Devin dramatically reduced his drinking, quickly recognizing that it had become a problem and contributed to the spiral that led to January 6. He stopped his weekly Thursday-Friday-Saturday bar ritual. He stopped getting intoxicated. (PSR ¶ 67).

**Third**, as Devin started reconnecting with the real world, he recognized that living alone was a mistake. In October 2021, he started living with his friends again. As Devin says in his own words, "[i]nstead of ignoring the stress and anxiety of everyday life and attempting to numb it through alcohol or digital distractions, I shared what was bothering me and relied on my friends for support, and offered my support in return." (Exhibit A at 4). He developed remarkable insight into exactly how he got to where he was on January 6, recognizing that connection with real-life friends was the antidote:

> I had a very rigid way of looking at situations and people. When I am isolated in my own mind I know it is easy for me to assume things and come to conclusions that aren't necessarily true. On the other hand, when I have dialogue with friends and listen to their input, they can highlight to me when my thinking could be out of line or unfair.

(*Id.*).

He also later joined a faith community, further cementing his community ties. As another churchgoer who got to know Devin after January 6 describes, Devin volunteered at their "2022 summer church youth camp, where he led a very successful boxing activity that was loved by both youth and staff. He also helped in the kitchen and assisted in a variety of other activities." (Exhibit E). Summing up his character, she writes, "We have been attending church with him and have

gotten to know him well. Devin is a very kind, cheerful, friendly, positive, generous and well mannered young man . . . ." (*Id.*)

**Fourth,** Devin knew he needed real mentorship for the first time in his life. As noted above, he never had a positive role model as a child. So he reached out, on his own initiative, to Reverend Johannes L. Jacobse for guidance mere months after January 6, in the summer of 2021. As Rev. Jacobse writes in the attached letter (Exhibit I), "When a man calls me unsolicited as Devin did, I already know that the potential for progress is good." (*Id.*) As Rev. Jacobse explains, when he first met Devin, he recognized that what Devin "missed were some necessary constituents of self-understanding; things that he should have learned from his parents that were either taught poorly or not at all." (*Id.*).

Since getting to know Devin, Rev. Jacobse observed that Devin "expressed remorse over his lack of judgment and has deep regret that he got caught up in the spirit of the protest. In all our conversations I was impressed by his sobriety and prescience of thought and expression." (*Id.*; *see also* PSR ¶ 30 ("During the presentence interview the defendant indicated he feels he made an impulsive decision that he regrets.")). Devin has been participating in regular counseling ever since. (PSR ¶ 63).

**Fifth**, Devin got married, and his wife maintains a positive presence in his life. In Devin's own words, she is "practical, realistic, and sensible. She gives me so much to look forward to that I don't want to do stupid things that could endanger my physical safety or freedom." Most recently, Devin became a father, and his newborn daughter is about two months old. (PSR ¶ 55). She has further taught Devin about responsibility. (*See* PSR ¶ 54 ("The defendant not  only provides for the family financially but provides emotional support and helps out with the daily responsibilities pertaining to their baby daughter.")).  Devin has had to grow quickly in his responsibilities given that his wife is a full-time caretaker, and their only other source of financial support is "benefits from the Women Infants and Children (WIC) program." (*Id.*).

Lastly, Devin has consistently maintained employment, maintaining a near-5-star review online for his small business. More importantly, Devin continues to use his company to help and mentor

people with criminal histories, such as Jeramy Freels, who is a convicted felon that Devin hired a year ago. As Mr. Freels says, "My background isn't the most desirable to be honest I'm actually a convicted felon with a pretty rough back story" (Exhibit F), yet Devin hired him anyway, giving him "a chance to show him the kind of worker and person I could be." (*Id.*) Devin has made a major impact on Mr. Freels's life: "[Devin is] the kind of boss that pushes you to be better but being around him makes you want to be better also[.] I couldn't ask for a better person or influencer in my life[.]" (*Id.*). When Mr. Freels casually mentioned at work needing a more affordable place to live, Devin helped Mr. Freels obtain a camper so that he would not become homeless. (*See id.*).



*Devin, second from left, with Cool Movers employees*

Meanwhile, he has continued to help others: helping a friend pay off his $3,000 car payment (Exhibit D at 1), helping another friend move homes free of

charge (Exhibit J), being the first to donate $100 "without batting an eye" to a fundraiser "for impoverished people in Africa" (*id.*), and praying with a friend "on the phone late at night when I had no one else to call on multiple occasions" (*id.*). As Tyler Staley aptly summarizes, "Time and time again Devin has shown me who he truly is, someone who is always ready to help others and expects nothing in return because that's what friends do." (Exhibit K).

Devin's commitment to taking responsibility and doing the right thing is also reflected in his perfect performance on pretrial release. All his drug tests have been clean, he follows his supervising officer's directions, and he has been meticulous about advising her of his travel plans. (*See* Exhibit G (lengthy list of email reporting travel out of district necessitated by work)). He even reported his contact with law enforcement when he called 911 to help some car-accident victims stranded on the side of the road. (Exhibit G at 1).

The best summary of Devin's personal transformation, critical self-insight, and determination not to let what happened on January 6 happen again, is his own words:

> 2022 was definitely a year of deepening relationships in my life and I found that when I felt this sense of closeness, connection and support my anxiety decreased dramatically. Negative content became less appealing, and I became oriented more toward positive and constructive things.
>
> I learned that, yes, bad things do happen in this life, but that life can't come to a standstill until everything gets resolved the way I think it should be resolved. Instead, I have to accept that there are a lot of things outside of my control and that a lot of these things which I don't may never change.

> I can choose to focus on these negative things and become consumed by this anger, or I can focus on the good things I have and channel my desire for change into things I can control, by helping people in my immediate surroundings and appreciating all the good things life has to offer, such as my faith, and faith community my friends, family, nature and these sorts of things.
>
> I am a much happier and more stable person since implementing these changes.

(Exhibit A at 4).

## Argument

Actions speak louder than words. Devin McNulty's firm rejection of what happened on January 6 is illustrated by his personal transformation undertaken immediately after January 6, long before he was arrested.

Devin was also relatively young, only 24 years old, when he committed this offense. As this Court is well aware, proposed Sentencing Guidelines amendments have signaled to courts that they should consider the youth of an offender, given that young offenders' brains are still developing even into their mid-twenties. (*See* Exhibit L (proposed Guidelines amendment)). Devin's youth helps explain how he exercised poor judgment and engaged in such aberrant, out-of-character behavior.

In addition, this Court should compare this case with other January 6 cases where the defendant engaged in significantly more violent assaultive conduct than Devin's, yet received sentences far lower than Devin's Guidelines range of 24-30 months. For example:

- Grayson Sherrill, 1:21-cr-00282-TSC, received a sentence of 7 months' imprisonment; Mr. Sherrill was a 21-year-old man who "violently swung and struck [an] officer with a metal pole" and "roamed the Capitol building for 34 minutes, banged on a door with his metal pole, [and] joined a mob of rioters

that overtook a police line in the Crypt," ECF No. 124 at 2;

- Mark Leffingwell, 1:21-cr-00005-ABJ, received a sentence of 6 months' imprisonment; Mr. Leffingwell was a 57-year-old man who "struck two officers in the head," ECF No. 31 at 2;

- David Blair, 1:21-cr-00186-PJD, received a sentence of 5 months' imprisonment; Mr. Blair was a 26-year-old man who "pushed his lacrosse stick into [an officer's] upper chest area" and was found with a knife and duct tape in his backpack, ECF No. 55 at 9;

- Joseph Leyden, 1:22-cr-00314-TNM, received a sentence of 6 months' imprisonment; Mr. Leyden was a 55-year-old man who "lift[ed] up" a bike rack barricade and "put his full weight into pushing the police line back and out of the way of the mob" and did it "repeatedly," "causing" an officer to "fall backwards, landing under the barricade, pinned and restrained there," "sustain[ing] bodily injuries, including a significant injury to her knee," and "Leyden made no effort to help [the officer] after he realized she was trapped under the bike rack," ECF No. 50 at 5, 8;

- Matthew Ross Council, 1:21-cr-00207-TNM, received a home confinement sentence of 6 months, ECF No. 75 at 3, 5; Mr. Council "lowered his head, stuck out his arms, and rammed into a line of police officers, pushing them back," and after January 6, Mr. Council "continued to embrace conspiracy theories, advertise himself as a political prisoner, and support others in their defiance of the government," ECF No. 64 at 2.

Devin pushed against an officer's riot shield multiple times, which he deeply regrets. But in marked contrast to these other offenders, Devin never struck an officer, never carried any kind of weapon like a pole or stick, and did not injure anyone. Devin also engaged in mitigating conduct, at one point physically protecting an officer who had fallen to the ground—as opposed to Mr. Leyten, who did not care when a vulnerable officer was trapped under a bike-rack barricade. And unlike Mr. Council, who responded to January 6 with defiance on social media, Devin responded to January 6 by immediately turning away from such behavior and

engaging in critical self-reflection. Accordingly, this Court should impose a sentence on Devin that is lighter than the above exemplars.

Based on: (1) Devin's extraordinary actions immediately following January 6, such as cutting off Internet access, overcoming alcohol abuse, reconnecting with community, and intense self-reflection; (2) Devin's youth at the time of the offense (24 years old); (3) Devin's exceptionally kind nature as expressed, for example, by his hiring and mentoring of those with criminal backgrounds, and thus the highly aberrational nature of his criminal conduct; (4) Devin's mitigating conduct on January 6, i.e., protecting a vulnerable officer and administering care to someone injured by tear gas; (5) ███████████████████████████████████████████████████████████████████████ and (6) the need to impose a fair sentence in light of other January 6 defendants who received sentences of 7 months or less for significantly more violent conduct, we respectfully submit that a sentence of probation, with or without a term of home confinement, is no greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Sean Jengwei Young*
SEAN JENGWEI YOUNG
GEORGIA BAR NO. 790399

*/s/ Colin M. Garrett*
COLIN M. GARRETT
GEORGIA BAR NO. 141751

ATTORNEYS FOR MR. MCNULTY

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530
Sean_Young@FD.org